932 So.2d 1009 (2006)
Joe Elton NIXON, Appellant,
v.
STATE of Florida, Appellee.
Joe Elton Nixon, Petitioner,
v.
James R. McDonough, etc., Respondent.
Joe Elton Nixon, Appellant,
v.
State of Florida, Appellee.
Nos. SC92006, SC93192, SC01-2486.
Supreme Court of Florida.
April 20, 2006.
Rehearing Denied June 16, 2006.
*1013 Eric M. Freedman, New York, NY, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Joe Elton Nixon, a prisoner under a sentence of death, appeals an order of the trial court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. Additionally, he files a petition for a writ of habeas corpus with this Court. We have jurisdiction. See art. V, § 3(b)(1),(9), Fla. Const. We issued an opinion in this case which addressed Nixon's claim that trial counsel was ineffective for conceding his guilt to first-degree murder without his consent. We reversed the conviction and remanded for a new trial. See Nixon v. State, 857 So.2d 172 (Fla. 2003). The United States Supreme Court accepted the case for certiorari review and reversed this Court's decision. See Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). We now readdress the ineffective assistance of counsel claim on the issue of concession of guilt, and we address the other issues raised in Nixon's appeal from the denial of 3.851 relief, as well as the issues raised in the habeas petition. For the reasons that follow, *1014 we affirm the trial court's denial of postconviction relief, and we deny habeas relief.

FACTS AND PROCEDURAL HISTORY
Joe Elton Nixon was charged, convicted, and sentenced to death for the 1984 murder of a Tallahassee woman. This Court affirmed the conviction and sentence on direct appeal. See Nixon v. State, 572 So.2d 1336 (Fla.1990).[1] The United States Supreme Court denied Nixon's petition for a writ of certiorari. See Nixon v. Florida, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 128 (1991). Subsequently, in 1993, Nixon filed a rule 3.850 motion, which the trial court denied without an evidentiary hearing. Nixon appealed the trial court's summary denial of his 3.850 motion to this Court. Additionally, Nixon filed a petition for a writ of habeas corpus with this Court. Nixon raised seven issues relating to the denial of his rule 3.850 motion[2] and three issues in his habeas petition.[3]See Nixon v. Singletary, 758 So.2d 618 (Fla.2000).[4]
In Nixon II, this Court found the primary issue to be Nixon's claim that he was denied effective assistance of counsel when his lawyer conceded guilt without his consent. Nixon's counsel made the following statement during opening argument of the guilt phase:
In this case, there will be no question that Jeannie [sic] Bickner died a horrible, horrible death. Surely she did and that will be shown to you. In fact, that horrible tragedy will be proved to your satisfaction beyond any reasonable doubt.
In this case, there won't be any question, none whatsoever, that my client, Joe Elton Nixon, caused Jeannie [sic] Bickner's death. Likewise, that fact will be proved to your satisfaction beyond any reasonable doubt. This case is about the death of Joe Elton Nixon and whether it should occur within the next few years by electrocution or maybe its natural expiration after a lifetime of confinement.
Nixon, 758 So.2d at 620.
During closing argument, Nixon's counsel made the following statement:
Ladies and gentlemen of the jury, I wish I could stand before you and argue that what happened wasn't caused by Mr. Nixon, but we all know better. For *1015 several very obvious and apparent reasons, you have been and will continue to be involved in a very uniquely tragic case. In just a little while Judge Hall will give you some verdict forms that have been prepared. He'll give you some instructions on how to deliberate this case. After you've gotten those forms and you've elected your foreperson and you've done what you must do, you will sign those forms. I know you are not going to take this duty lightly, and I know what you will decide will be unanimous. I think that what you will decide is that the State of Florida, Mr. Hankinson and Mr. Guarisco, through them, has proved its case against Joe Elton Nixon. I think you will find that the State has proved beyond a reasonable doubt each and every element of the crimes charged, first-degree premeditated murder, kidnapping, robbery, and arson.
Id.
On appeal, the parties were in disagreement regarding the appropriate standard of review to be applied in the case. The State argued that the standard explained in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), should be applied, whereas Nixon argued that because counsel's concessions amounted to per se ineffective assistance of counsel, the United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), standard was the proper test. Ultimately, this Court held that if Nixon could establish that he did not consent to counsel's strategy, then the Court would find counsel to be per se ineffective under the Cronic standard. This Court reasoned that the Cronic standard should apply because:
Although statements made by attorneys in closing arguments are not evidence, nevertheless, for all practical purposes, counsel's admission of guilt on behalf of his client denied to petitioner his constitutional right to have his guilt or innocence decided by the jury. Petitioner, in pleading not guilty, was entitled to have the issue of his guilt or innocence presented to the jury as an adversarial issue. Counsel's complete concession of petitioner's guilt nullified the adversarial quality of this fundamental issue.
Nixon II, 758 So.2d at 623 (quoting Wiley v. Sowders, 647 F.2d 642, 650 (6th Cir. 1981)). Since counsel's comments operated as the "functional equivalent of a guilty plea," this Court concluded that "Nixon's claim must prevail at the evidentiary hearing below if the testimony establishes that there was not an affirmative, explicit acceptance by Nixon of counsel's strategy. Silent acquiescence is not enough." Id. at 624. To avoid similar problems in the future, this Court said:
[W]e hold that if a trial judge ever suspects that a similar strategy is being attempted by counsel for the defense, the judge should stop the proceedings and question the defendant on the record as to whether or not he or she consents to counsel's strategy. This will ensure that the defendant has in fact intelligently and voluntarily consented to counsel's strategy of conceding guilt.
Id. at 625 (citations omitted). Accordingly, we remanded the case to the trial court to hold an evidentiary hearing on the issue of whether Nixon consented to trial counsel's strategy.[5]
On remand, an evidentiary hearing was held before Judge Janet Ferris on May 11, *1016 2001. Although Nixon was present at the evidentiary hearing, he did not testify; the only witness presented was Michael Corin, Nixon's trial counsel. After the hearing, the trial court denied relief and found that Nixon consented to counsel's strategy. On appeal to this Court, we applied the per se ineffective assistance of counsel standard from United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), found counsel ineffective, and remanded for a new trial. See Nixon v. State, 857 So.2d 172 (Fla.2003).
The United States Supreme Court granted certiorari review and held that claims of ineffective assistance of counsel based on counsel's concession of guilt to the crime charged, even without the defendant's consent, are to be analyzed under the principles enunciated in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). We now determine all of Nixon's ineffective assistance of counsel claims under that standard and address the other issues raised in this 3.850 appeal and the habeas petition.[6]

LAW AND ANALYSIS

Motion for Postconviction Relief

Ineffective Assistance of Counsel/Concession of Guilt
We initially held that Nixon was entitled to a new trial because the defense attorney conceded his guilt to first-degree murder without obtaining his consent to this trial strategy. See Nixon v. State, 857 So.2d 172 (Fla.2003). Our grant of a new trial was based on this Court's earlier opinion in this case which held that the per se standard of ineffective assistance of counsel was applicable to a situation where the defendant had not agreed to trial counsel's strategy of conceding guilt to the crime charged. See Nixon v. Singletary, 758 So.2d 618 (Fla.2000). However, the United States Supreme Court granted certiorari review and said:
We granted certiorari, [Florida v. Nixon,] 540 U.S. 1217, 124 S.Ct. 1509, 158 L.Ed.2d 152 (2004), to resolve an important question of constitutional law, i.e., whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient, and whether counsel's effectiveness should be evaluated under Cronic or Strickland.

Florida v. Nixon, 543 U.S. 175, 186-87, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). After a discussion of the issue, the supreme court answered this question and held:
To summarize, in a capital case, counsel must consider in conjunction both the guilt and penalty phases in determining how best to proceed. When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. Instead, if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the Strickland *1017 standard, that is the end of the matter; no tenable claim of ineffective assistance would remain.
Id. at 192, 125 S.Ct. 551.
Therefore, in order to obtain relief based on ineffective assistance of counsel for conceding guilt without the defendant's consent, the defendant must demonstrate that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance as required under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the performance prong of Strickland, the defendant must establish that "counsel made error so serious that counsel was not functioning as the `counsel' guaranteed by the Sixth Amendment." Strickland 466 U.S. at 687, 104 S.Ct. 2052. On the prejudice prong, the reviewing court must determine whether there is a reasonable probability that, but for the deficiency, the result of the proceeding would have been different. See id. at 695, 104 S.Ct. 2052. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome" of the proceeding. Id. at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687, 104 S.Ct. 2052.
This issue was first brought to this Court's attention during the direct appeal proceedings. Nixon argued that his trial counsel was ineffective for conceding his guilt during the guilt/innocence phase of the trial. We did not address the issue at that time,[7] but invited the defendant to raise the issue in postconviction proceedings. The issue was in fact raised in Nixon's 1993 motion for postconviction relief. The trial judge summarily denied relief, and specifically denied Nixon's claim that under United States v. Cronic counsel was per se ineffective for conceding the defendant's guilt. On appeal, this Court reversed the summary denial and held the ineffective assistance of counsel claim should be analyzed under the framework of Cronic and remanded to the trial court for an evidentiary hearing on this issue. See Nixon II, 758 So.2d at 625.
At the subsequent evidentiary hearing, the only witness was Nixon's trial counsel, Mr. Corin; Nixon did not testify at the hearing. Counsel testified that his strategy was to attempt to save Nixon's life. He indicated that he wanted to show that while the State could prove Nixon committed certain acts, there were still good reasons why the defendant should not be sentenced to death. Corin further testified that he explained this strategy to Nixon on several occasions, and Nixon did not say or do anything after the discussions. Corin's testimony was consistent with the testimony he gave at an evidentiary hearing in 1988. The trial judge found that Nixon's normal pattern of communicating with trial counsel was by passively receiving information.
The Supreme Court, viewing the same facts and testimony, found trial counsel was not required to get the express consent of Nixon to the trial strategy. Specifically the Court said:
Corin was obliged to, and in fact several times did, explain his proposed trial strategy to Nixon. See supra, at 181, 186[, 125 S.Ct. 551]. Given Nixon's constant resistance to answering inquiries put to him by counsel and court, see *1018 Nixon III, 857 So.2d, at 187-188 (Wells, J., dissenting), Corin was not additionally required to gain express consent before conceding Nixon's guilt. The two evidentiary hearings conducted by the Florida trial court demonstrate beyond doubt that Corin fulfilled his duty of consultation by informing Nixon of counsel's proposed strategy and its potential benefits. Nixon's characteristic silence each time information was conveyed to him, in sum, did not suffice to render unreasonable Corin's decision to cede guilt and to home in, instead, on the life or death penalty issue.
Florida v. Nixon, 543 U.S. at 189, 125 S.Ct. 551.
Trial counsel pursued a strategy of trying to avoid a sentence of death, because the totality of the evidence in this case demonstrated Nixon committed the various acts constituting murder. As the Supreme Court indicated, "Counsel therefore may reasonably decide to focus on the trial's penalty phase. . . ." Nixon, 543 U.S. at 191, 125 S.Ct. 551. Counsel's performance was not deficient under the facts and circumstances of this case.
Because trial counsel's performance was not deficient, we need not address the prejudice prong of Strickland. See Downs v. State, 740 So.2d 506, 518 n. 19 (Fla.1999) (indicating there is no need to address the prejudice prong if the defendant has failed to establish deficient performance). Trial counsel was not ineffective for conceding guilt to first-degree murder.

Evidentiary Hearing on the Brady/Giglio Claims
Nixon next claims the trial court erred in failing to conduct an evidentiary hearing on his claims that the prosecutor withheld certain exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He also alleges he was entitled to an evidentiary hearing on his claim that the State knowingly used false or misleading evidence in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Generally, a defendant is entitled to an evidentiary hearing unless the postconviction motion or any particular claim in the motion is legally insufficient or the allegations in the motion are conclusively refuted by the record. See Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). In order to support summary denial, the trial court must either state its rationale in the order denying relief or attach portions of the record that would refute the claims. See Anderson v. State, 627 So.2d 1170, 1171 (Fla.1993). Additionally, where no evidentiary hearing has been held, an appellate court must accept the defendant's factual allegations as true to the extent that such allegations are not refuted by the record. See Peede v. State, 748 So.2d 253, 257 (Fla.1999). The burden is on the defendant to establish a legally sufficient claim. See Freeman, 761 So.2d at 1061. Based on these principles, we affirm the trial court's summary denial of these claims because the evidence was not material and the State did not use false or misleading evidence.[8]
In order to demonstrate a Brady violation, the defendant must establish that the State suppressed material evidence that was favorable to the accused (i.e., the evidence was either exculpatory *1019 or impeaching) and that he was prejudiced by the State's suppression. See Strickler v. Greene, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). If it is demonstrated that material evidence was suppressed, the next inquiry must be whether the favorable evidence would put the whole case in such a different light as to undermine confidence in the outcome. See Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); Occhicone v. State, 768 So.2d 1037, 1041 (Fla. 2000). In this case, even assuming that the State withheld evidence, this Court's first inquiry must be whether that evidence was material. As the Supreme Court said in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
Nixon argues the State withheld information that Lamar Nixon, the defendant's uncle, said he saw the defendant in another town around the time of the murder. He also claims the State withheld information that John Nixon and Wanda Robinson, two witnesses who testified for the State, received money from the sheriff's office for their testimony, that John Nixon received favorable treatment on his case,[9] that John Nixon was threatened with an outstanding arrest warrant, and that John Nixon was an informant for the State.[10] We accept these allegations as true but find that this evidence does not meet the test of materiality set forth in Bagley and its progeny. We further find that there is no reasonable probability that the result of the trial would have been different; in other words, our confidence in the outcome of the trial has not been undermined.
Although Lamar Nixon stated the defendant was in another town near the time of the murder, this statement is contradicted by the other evidence in this case, including the defendant's confession to three persons and the physical evidencethe defendant's hand print was found on the victim's car. The defendant was also seen driving the victim's car on the day of the murder. In addition, another witness at the trial, Wanda Robinson, testified that Lamar Nixon was with her at the time he claims to have seen the defendant in Woodville. Several other witnesses placed the defendant with the victim near a mall in Tallahassee at the same time.
Despite the fact that John Nixon indicated in an affidavit executed in 1993, some eight years after Joe Nixon's trial, that he and Wanda Robinson received money from the sheriff's office for their testimony, in 1984 both he and Robinson stated they had not received anything in exchange for their testimony. They further indicated there had been no threats or coercion on the part of the State to elicit their testimony. Moreover, given the evidence that was introduced connecting the defendant to this murder, there is no reasonable probability *1020 that this impeachment evidence would have resulted in a different verdict.
The trial court did not err in summarily denying Nixon's claims based on Brady and Giglio.

Mental Competence
Nixon's next allegation involves his claim that he was incompetent to stand trial. He also alleges that he is mentally retarded and suffers from organic personality disorder.[11] He bases these allegations primarily on the fact that during the trial he acted "bizarre," in that he disrobed down to his underwear (not in the presence of the jury), demanded a black judge and a black attorney, and refused to return to the courtroom. After conducting a hearing in the holding cell on Nixon's continued refusal to return to the courtroom, the trial court informed Nixon that his failure to return to court that afternoon would result in a finding that he had knowingly, voluntarily, and intelligently waived his right to be present during the trial. When Nixon refused to come to the courtroom during the afternoon, the trial court made the finding of voluntary waiver of attendance, and the trial continued in his absence.
On direct appeal, this Court addressed the issue of voluntariness and said that a defendant can waive his right to be present at any stage of a capital trial if he personally and voluntarily absents himself. After reciting the factual circumstances of Nixon's absence, we found no error in the trial court's decision to conduct the trial in Nixon's absence. See Nixon I, 572 So.2d at 1341-42. Based on the same facts, Nixon now raises essentially the same issue under the guise that the trial court erred by not sua sponte ordering a competency determination and trial counsel was ineffective in not requesting a competency determination.
Nixon has failed to demonstrate error by the trial court or trial counsel. First, it must be noted that the trial judge was familiar with this defendant because he had presided over a competency hearing concerning the defendant in another case, and the defendant was determined to be competent in that proceeding. The competency hearing in the prior case took place a short time before the trial court proceedings in this case. The trial judge knew that in the earlier case, Nixon had threatened to disrupt the courtroom. Nixon was again threatening to disrupt the proceedings. These actions did not require the trial court to have Nixon examined for competency.
Second, trial counsel had no reason to request a competency determination. Nixon had been examined by a mental health expert who did not give trial counsel any reason to delve further into competency. In fact, trial counsel indicated that had he been aware of any basis, he would have filed a motion for a competency evaluation. In Ake v. Oklahoma, 470 U.S. 68, 82, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court said, "A defendant's mental condition is not necessarily at issue in every criminal proceeding. . . ." When there is no reason to suspect that a defendant is incompetent, it cannot be deficient performance if counsel does not request a competency examination. See, e.g., Mills v. State, 603 So.2d 482, 485 (Fla.1992) (finding no deficient performance where counsel had no reason to believe that mental mitigation could be developed).
*1021 Thus, the record does not support Nixon's claim that trial counsel erred in failing to request a competency determination.

Ineffective Assistance of Counsel/Penalty Phase
Nixon claims that counsel was ineffective in the penalty phase because he failed to investigate and introduce available mitigating evidence, argued evidence that was devastating to Nixon's case for mercy, and permitted the State to argue improper aggravating circumstances. We must determine, based on the alleged facts, whether trial counsel's performance was deficient and, if so, whether Nixon was prejudiced by any deficiency. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We find that the trial court did not err in summarily denying this claim because the allegations of deficient performance are refuted by the record.
The record demonstrates that trial counsel investigated the defendant's background, including his criminal history background. Trial counsel met with the defendant and his mother, who did not tell counsel of the abuse that Nixon now presents. Moreover, the jury was presented evidence of Nixon's troubled childhood and his mental and emotional problems. Counsel introduced fifty exhibits and called nine witnesses to support his arguments concerning mitigation in the form of Nixon's background and mental and emotional problems. Counsel retained the services of two mental health experts, and both of these experts testified that the two statutory mental mitigators applied in this case. In addition counsel introduced a number of documents that the mental health experts relied upon in reaching their conclusions. Clearly, counsel based his strategy for the penalty phase on the evidence he uncovered after a thorough investigation. See Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting Strickland and stating that strategic decisions made after a thorough investigation of the facts and the law are virtually unchallengeable); see also Zakrzewski v. State, 866 So.2d 688, 693 (Fla.2003).
Nixon argues that trial counsel should not have introduced these documents because they contain information about his criminal history. However, trial counsel's strategy at the penalty phase was to focus on Nixon's mental health problems. Counsel made a strategic decision to introduce this evidence although there was other information in the records. Moreover, much of Nixon's prior criminal history was before the jury because the State argued and the trial court found prior violent felonies and contemporaneous felonies as aggravating circumstances. While present counsel would have proceeded differently in hindsight, that is not the standard applicable to claims of ineffective assistance of counsel. See Cherry v. State, 659 So.2d 1069, 1073 (Fla.1995) (finding trial counsel not ineffective based on strategic decisions and holding that the standard is not how present counsel would proceed in hindsight). Counsel in this case cannot be found ineffective based on his strategic decision. See Zakrzewski, 866 So.2d at 693.
The trial strategy from the beginning of this case was to concede that Nixon was the perpetrator of events that led to this murder. Thus, in the opening statement, counsel for Nixon agreed that the victim's death was horrible; the victim was tied to a tree and terrorized, and her body was set on fire while she was still alive. However, the defense focused on arguing that despite the facts of the crime, Nixon was a life worth saving because of his troubled childhood, his mental and emotional problems, *1022 and the fact that he was convicted of three other felonies which carried lengthy sentences. The mere fact that counsel did not attempt to downplay a terrible death does not demonstrate that counsel's performance was deficient.
Furthermore, this statement by defense counsel standing alone did not assist the State in proving the aggravating circumstances of heinous, atrocious, or cruel (HAC), and cold, calculated, and premeditated without any pretense of legal or moral justification (CCP). These two aggravating factors are supported by the evidence presented at trial, including the following information obtained from the defendant's taped confession as outlined in the direct appeal:
After his arrest, in a taped confession which was played to the jury, Nixon admitted murdering Ms. Bickner. He described how he met Ms. Bickner at the mall and asked her to take him to his uncle's house because he was having car trouble. Once on the road, Nixon hit Bickner in the face. When she stopped the car, Nixon put her in the trunk and then drove to a secluded wooded area where he took her from the trunk and tied her to a tree with jumper cables. According to Nixon, the two talked about their lives. Ms. Bickner offered to give Nixon money, to sign her car over to him, begging him not to kill her. Nixon recounted how he burned Ms. Bickner's personal belongings and then threw the top of the convertible into the fire. At some point after placing a paper bag over her head, Nixon threw the smoldering convertible top on Ms. Bickner, setting her on fire. He then left the scene in the M.G. According to the medical examiner, Ms. Bickner was alive at the time she was set on fire and the fire was the cause of death.
See Nixon I, 572 So.2d at 1338. Thus, the aggravating circumstances of HAC and CCP were based on the evidence and not a statement by defense counsel that acknowledged the awful facts of this murder. The record in this case refutes the claim that counsel was ineffective in the penalty phase.

Adequacy of Mental Health Evaluation
Nixon next claims he was denied a competent mental health evaluation in violation of the principles enunciated in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Pursuant to Ake, a defendant is entitled to have access to a competent mental health expert who will conduct an examination of the defendant and assist in evaluating, preparing, and presenting a mental health defense. The defendant in this case had the assistance of two mental health experts. Both Dr. Merton L. Ekwall and Dr. Allen L. Doerman performed extensive evaluations of Nixon that included neuropsychological testing, interviews, and reviews of pertinent documents and records. These documents and records included records of childhood discipline, records from correctional institutions, psychiatric reports, psychological reports, and records from group treatment homes. The fact that Nixon has now found mental health experts who have different opinions and who say he is mentally retarded does not demonstrate that the initial experts' evaluations were insufficient. See Rose v. State, 617 So.2d 291, 295 (Fla.1993).
We affirm the trial court's denial of relief on Nixon's claim that he had an incompetent mental health evaluation.

Racial Discrimination
Nixon argues he should be allowed to prove that racial discrimination tainted his conviction and death sentence. He argues that State witnesses improperly *1023 gave racial descriptions of him as a black male and of the victim as a white female. We affirm the trial court's denial of relief on this matter. While Nixon offers statistics concerning the number of homicides in Leon County involving white victims and black victims and the percentage of death penalties received in these categories, he does not make an allegation that the State acted with purposeful discrimination in seeking the death penalty in his case. This is the standard a defendant must meet in making a racial discrimination claim. See Robinson v. State, 865 So.2d 1259, 1263-64 (Fla.2004); Foster v. State, 614 So.2d 455, 463 (Fla.1992). Nixon's additional argument ignores the fact that the racial descriptions used by the witnesses were presented in instances where the witness could not identify the defendant or the victim by name.
We find no error in the trial court's summary denial of these claims.

Prior Violent Felony Aggravator
As his last 3.850 claim, Nixon argues that the two prior felonies used to support the prior violent felony aggravator were not valid. He argues that under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), an invalid prior felony cannot be used to support this aggravating circumstance. The trial court properly denied this claim because the prior violent felonies used in Nixon's case have not been vacated and are still valid convictions. See Buenoano v. State, 708 So.2d 941, 952 (Fla.1998).

Petition for Writ of Habeas Corpus

Ineffective Assistance of Appellate Counsel
Nixon argues three instance in which he claims appellate counsel was ineffective: failure to raise the competency issue on appeal; failure to properly preserve his claim under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); and failure to preserve his claim under James v. State, 615 So.2d 668 (Fla. 1993), and Jackson v. State, 648 So.2d 85 (Fla.1994). Claims of ineffective assistance of appellate counsel are properly raised in a habeas petition before the court that heard the defendant's direct appeal. See Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000). The standard to be applied to these claims parallels the standard applied to claims involving the effectiveness of trial counsel as set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, a defendant must demonstrate that appellate counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Prejudice is demonstrated by showing that the appellate process was compromised to the degree that confidence in the correctness of the appellate result is undermined. See Rutherford, 774 So.2d at 643. Moreover, the appellate court must presume that counsel's performance falls within that wide range of reasonable professional assistance.
Nixon's first ineffective assistance of appellate counsel claim, that appellate counsel should have recognized from simply reading the record that Nixon was incompetent to proceed at trial, is basically the same claim he raised in his 3.850 motion concerning trial counsel. As noted above, trial counsel did not request a competency determination, and the record does not support a finding that Nixon was incompetent. Appellate counsel cannot be ineffective for failing to raise an issue that has not been preserved for appeal, that is not fundamental error, and that would not be supported by the record. See Medina v. Dugger, 586 So.2d 317, 318 (Fla.1991). Ineffective assistance of appellate counsel has not been demonstrated on this issue.
*1024 Likewise, we find that appellate counsel was not ineffective for failing to properly preserve the Ake claim. Nixon argues that appellate counsel, based solely on a reading of the record, should have realized that he had an incompetent mental health evaluation. The record demonstrates that trial counsel requested and received the assistance of two mental health professionals. These professionals examined the defendant, reviewed documentation concerning the defendant, prepared reports after their examinations, and testified at the penalty phase. Nixon has neither alleged nor demonstrated any specific omissions by these professionals that could have been successfully argued on appeal. Ineffective assistance of appellate counsel has not been demonstrated.
Nixon also claims that appellate counsel was ineffective for failing to argue that the jury instructions on the aggravating factors of HAC and CCP were vague and cites to this Court's decisions in James and Jackson. Again, this is an issue which was not preserved for appellate review by objection in the trial court. Trial counsel did not object to the HAC instruction, only argued CCP as improper doubling, and did not propose alternative instructions for either HAC or CCP. Moreover, at the time of the direct appeal, neither instruction had been invalidated. Thus, habeas relief is not warranted on this issue.

Apprendi/Ring Issue
Nixon also argues that his death sentence is unconstitutional because it is based on facts not included in the jury's verdict of guilty to the first-degree murder charge. He relies on the decisions by the United States Supreme Court in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court has held that Ring is not retroactive in Florida under the test espoused in Witt v. State, 387 So.2d 922 (Fla.1980). See Johnson v. State, 904 So.2d 400 (Fla.2005).[12] Thus, Ring is not applicable in this instance because Nixon's case became final more than a decade before Ring was decided.

Mental Retardation
As his last habeas claim, Nixon argues he is mentally retarded and therefore cannot be constitutionally executed. The record before this Court does not demonstrate that the defendant is mentally retarded. To the extent that Nixon is eligible to pursue a claim of mental retardation under Florida Rule of Criminal Procedure 3.203, he should do so within sixty days of the release of this opinion.

CONCLUSION
Accordingly, for the reasons stated above, we affirm the trial court's denial of postconviction relief, and we deny habeas relief.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, and CANTERO, JJ., concur.
ANSTEAD, J., concurs in result only.
BELL, J., did not participate.
NOTES
[1] Hereafter referred to as Nixon I.
[2] The issues raised in Nixon's appeal of the denial of his 3.850 motion were: (1) whether the trial court denied Nixon a full and fair hearing on his ineffective assistance of counsel claim; (2) whether Nixon was denied his right not to be tried while mentally incompetent; (3) whether Nixon's death sentence had to be set aside because his counsel failed to make an effective argument for sparing his life and presented evidence that was harmful to his case during the sentencing phase of the trial; (4) whether Nixon was denied a competent mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) whether Nixon was entitled to prove his claims under Johnson v. Mississippi, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), that the two prior convictions used as aggravating circumstances lacked validity; (6) whether Nixon should have the opportunity to prove that race discrimination tainted his conviction and death sentence; and (7) whether the jury weighed invalid and unconstitutionally vague aggravating circumstances in violation of James v. State, 615 So.2d 668 (Fla.1993), and Jackson v. State, 648 So.2d 85 (Fla.1994).
[3] In his habeas petition Nixon argued that: (1) appellate counsel failed to raise on direct appeal any issue regarding Nixon's competency to stand trial; (2) appellate counsel failed to properly preserve Nixon's claims under Ake v. Oklahoma; and (3) appellate counsel failed to properly preserve Nixon's claims under James v. State and Jackson v. State.
[4] Hereafter referred to as Nixon II.
[5] This Court declined to address the remaining issues in Nixon's 3.850 appeal. Additionally, this Court opted not to address Nixon's habeas claims given its disposition of his 3.850 appeal. Nixon II, 758 So.2d at 625.
[6] We do not address in detail Nixon's claims that the jury was allowed to consider the aggravating circumstances of heinous, atrocious or cruel and cold, calculated and premeditated because these issues are procedurally barred. See James v. State, 615 So.2d 668, 669 (Fla.1993). Moreover, counsel cannot be found ineffective for failing to object to instructions which had not been invalidated at the time of trial. See Waterhouse v. State, 792 So.2d 1176, 1196 (Fla.2001).
[7] The issue had been remanded to the trial court for an evidentiary hearing, but Nixon would not waive his attorney-client privilege, and trial counsel could not testify concerning the matter. See Nixon I, 572 So.2d at 1340.
[8] While rule 3.851(f), Florida Rules of Criminal Procedure, provides for an evidentiary hearing on claims listed in the initial postconviction motion as requiring a factual determination, this portion of the rule was added in 2001, subsequent to the filing of the motion in this case.
[9] John Nixon was charged in 1986 with kidnapping, assault, and sexual battery. The charges were brought after Joe Elton Nixon's trial, which took place in July 1985.
[10] These allegations are also relied on to support Nixon's Giglio claim.
[11] Nixon does not make a separate argument on this issue beyond his argument that he was tried while incompetent.
[12] In addition, two of the aggravating factors found in this case are prior violent felony and murder during the commission of a kidnapping. As we have previously said, these aggravators take this case out of the purview of Ring. See Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003); Banks v. State, 842 So.2d 788, 793 (Fla.2003).